IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 11-00506 LEK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| FOUINA C. TOILOLO, (01) | ) | |
| ALOALII TOOTOO, (02) | ) | |
| KAISA TAI, (03) | ) | |
| HARRY AKANA, (07) | ) | |
| DANIEL FOLA, (08) | ) | |
| WALTER DOMINGUEZ, (10) | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS AND JOINDERS THERETO**

Before the Court are: Defendant Kaisa Tai's Third Motion to Dismiss Indictment ("Third Motion to Dismiss"), filed on January 14, 2014; Defendant Aloalii Tootoo's ("Tootoo") Fourth Motion to Dismiss Indictment, or in the Alternative, to Strike Testimony of Pulaa Gatoloai ("Fourth Motion to Dismiss"), filed February 10, 2014; and Defendant Fouina C. Toilolo's ("Toilolo") Fifth Motion for Dismissal with Prejudice as to Count 1 of the Third Superseding Indictment ("Fifth Motion to Dismiss"), filed March 31, 2014.[1] [Dkt. nos. 845, 995, 1182.] Toilolo filed a joinder in the Third Motion to Dismiss on January 14, 2014, and Defendant Walter Dominguez filed his joinder on January 21, 2014.

_____

[1] The Court will refer to the Third Motion to Dismiss, the Fourth Motion to Dismiss, and the Fifth Motion to Dismiss collectively as "the Motions to Dismiss."

[Dkt. nos. 853, 878.]  Toilolo filed a joinder in the Fourth

Motion to Dismiss on February 11, 2014.[2]  [Dkt. no. 996.]

Plaintiff the United States of America ("the

Government") filed its memorandum in opposition to the Third

Motion to Dismiss on January 21, 2014, and its memorandum in

opposition to the Fifth Motion to Dismiss on April 15, 2014.[3]

[Dkt. nos. 880, 1221.]  Toilolo, Tootoo, Kaisa Tai,

Walter Dominguez, Defendant Harry Akana ("Akana"), and Defendant

Daniel Fola (all collectively, "Defendants") filed a joint reply

in support of the Third Motion to Dismiss ("Joint Reply") on

January 24, 2014.  [Dkt. no. 918.]  Kaisa Tai also filed two

supplemental declarations of counsel in support of the Third

---

[2] On January 14, 2014, Tootoo, Akana, and Daniel Fola each
filed a joinder in the Third Motion to Dismiss.  [Dkt. nos. 846,
847, 851.]  On February 11, 2014, Kaisa Tai and Akana each filed
a joinder in the Fourth Motion to Dismiss.  [Dkt. nos. 998, 999.]

Akana and Daniel Fola's joinders were rendered moot by the
filing of their judgments of acquittal on February 12, 2014.
[Dkt. nos. 1010, 1011.]  On March 11, 2014, this Court filed its
Order Regarding Filings Rendered Moot by Judgments of Acquittal.
[Dkt. no. 1146.]  The order noted that judgments of acquittal
were entered as to Tootoo and Kaisa Tai on March 10, 2014, [dkt.
nos. 1143, 1144,] rendering moot: the Third Motion to Dismiss as
to Kaisa Tai; Tootoo's joinder in that motion; the Fourth Motion
to Dismiss as to Tootoo; and Kaisa Tai's joinder in that motion.
The Third Motion to Dismiss and the Fourth Motion to Dismiss
remain before this Court because of the joinders filed by Toilolo
and Walter Dominguez.

[3] The Government did not file a memorandum in opposition to
the Fourth Motion to Dismiss because this Court orally denied it
the day after it was filed.  See Tr. Trans. - Day 25 (2/11/14)
("Day 25 Trans."), filed 5/5/14 (dkt. no. 1262), at 144-45.

Motion to Dismiss on January 26, 2014 and January 27, 2014. [Dkt. nos. 919, 920.] Toilolo filed a reply in support of the Fifth Motion to Dismiss ("Toilolo Reply") on April 17, 2014. [Dkt. no. 1223.]

This Court decided the Motions to Dismiss without a hearing pursuant to Rule LR7.2(d) of the Local Rules of Practice of the United States District Court for the District of Hawai`i ("Local Rules").[4] After careful consideration of the motions, supporting and opposing documents, and the relevant legal authority, the Motions to Dismiss and the joinders thereto are HEREBY DENIED for the reasons set forth below. The instant Order supersedes this Court's prior oral and written rulings on the Motions to Dismiss.

## BACKGROUND

On May 26, 2011, Toilolo, Tootoo, Kaisa Tai, Louis Tai, Jordan Fonoti, Pulaa Gatoloai, Akana, and Daniel Fola were indicted for eight counts of drug-related offenses. [Dkt. no. 1.] The eight-count, Superseding Indictment was filed on June 23, 2011 against the eight defendants named in the original Indictment, plus one new defendant, John Tai. [Dkt. no. 95.] A fourteen-count, Second Superseding Indictment was filed on

---

[4] On April 29, 2014, this Court issued an entering order that: vacated the hearing on the Fifth Motion to Dismiss, which was scheduled for April 30, 2014; denied the motion; and stated that a written order would be filed later. [Dkt. no. 1234.]

May 16, 2012 against six of the defendants named in the
Superseding Indictment - Toilolo, Tootoo, Kaisa Tai, Louis Tai,
Akana, and Daniel Fola - plus five new defendants -
Walter Dominguez, Larry Hooheno Chung, Lloyd Talia,
Sifatutupu Fuamatu ("Mrs. Fuamatu"), and Falefia Fuamatu
("Mr. Fuamatu"). [Dkt. no. 236.] Mr. Gatoloai, Mr. Fonoti, and
John Tai entered guilty pleas on July 15, 2011, September 28,
2011, and April 12, 2012, respectively. [Minutes, filed 7/15/11
(dkt. no. 131); Minutes, filed 9/28/11 (dkt. no. 174); Minutes,
filed 4/12/12 (dkt. no. 228).]

An eighteen-count, Third Superseding Indictment was
filed on August 22, 2013 against six of the defendants named in
the Second Superseding Indictment - Toilolo, Tootoo, Kaisa Tai,
Akana, Daniel Fola, and Walter Dominguez, plus five new
defendants - Delanor Fola, Darryl Corniel, Osvaldo Dominguez,
Anthony Leon, and Shane Jackson ("2013 Defendants"). [Dkt. no.
433.] Mr. Chung, Louis Tai, Mr. Talia, Mrs. Fuamatu, and
Mr. Fuamatu entered guilty pleas on June 26, 2012, August 9,
2012, November 15, 2012, May 31, 2013, and June 14, 2013,
respectively. [Minutes, filed 6/26/12 (dkt. no. 270); Minutes,
filed 8/9/12 (dkt. no. 303); Minutes, filed 11/15/12 (dkt. no.
343); Minutes, filed 5/31/13 (dkt. no. 414); Minutes, filed
6/14/13 (dkt. no. 421).]

On October 23, 2013, the magistrate judge issued an order severing the case against Defendants from the case against the 2013 Defendants. [Dkt. no. 565.] The case was reassigned to this Court on November 5, 2013. [Dkt. no. 610.] Jury selection in Defendants' trial ("the First Trial") commenced on November 19, 2013, and the trial began on November 22, 2013. [Minutes, filed 11/19/13 (dkt. no. 705); Minutes, filed 11/22/13 (dkt. no. 723).]

## I.    Relevant Prior Rulings

From almost the moment this case was reassigned throughout the First Trial, this Court has been required to address repeated charges of discovery abuse, lack of diligence, and other improprieties lodged against the Government. This Court issued various rulings regarding these charges before the trial started and during the first few days of testimony, but the issues persisted. This Court therefore invited Defendants to file an omnibus motion seeking sanctions for discovery violations. On December 20, 2013, Defendants filed their Joint Motion for Dismissal with Prejudice Due to the Government's Repeated and Continuing Discovery Abuses and Violations ("Second Motion to Dismiss").[5] [Dkt. no. 793.]

_____

[5] On September 27, 2013, Walter Dominguez filed a motion to dismiss, alleging a speedy trial violation, and Kaisa Tai filed a similar motion on October 8, 2013 (collectively, "First Motions to Dismiss"). [Dkt. nos. 508, 526.] On October 18, 2013,
(continued...)

On January 8, 2014, this Court issued its oral ruling, granting the Second Motion to Dismiss in part and denying it in part. [1/8/14 Hrg. Trans., filed 2/7/14 (dkt. no. 991), at 19-20.] On March 17, 2014, it issued the written order on the Second Motion to Dismiss ("3/17/14 Order"). [Dkt. no. 1156.[6]] The Second Motion to Dismiss addressed the following alleged violations of <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963), <u>Giglio v. United States</u>, 405 U.S. 150, 154-55 (1972), the Jencks Act ("*Jencks*"), and Fed. R. Crim. P. 16:

-the failure to produce Mr. Fonoti's proffer letter dated June 9, 2011 until December 16, 2013, which was five days after he completed his trial testimony; 3/17/14 Order, 2014 WL 1091715, at *5;

-the failure to inform Defendants about Mr. Fonoti's initial statement to law enforcement officers, including Department of Homeland Security, Immigration and Customs Enforcement ("ICE") Special Agents James Chambers and Jason Pa, in which he made false statements and gave the agents made-up names because he did not want to disclose the identities of his co-conspirators; <u>id.</u> at *5-7;

-the failure to produce Mr. Gatoloai's proffer letter dated June 9, 2011 until December 16, 2013, which was six days after he completed his trial testimony; <u>id.</u> at *7;

---

[5](...continued)
Toilolo and Tootoo each filed a joinder in Kaisa Tai's motion. [Dkt. no. 554, 558.] At the October 21, 2013 hearing on the First Motions to Dismiss, Daniel Fola orally joined in the motions. [Amended Minutes, filed 10/21/13 (dkt. no. 567), at 3.] The issues raised in the First Motions to Dismiss, and the joinders thereto, are not relevant to the Motions to Dismiss currently before this Court.

[6] The 3/17/14 Order is also available at 2014 WL 1091715.

-the failure to disclose written material that the Government had
    in its possession regarding Mr. Gatoloai's misconduct during
    his cooperation in a prior case ("Toelupe Cooperation"),
    including telling his uncle, Packward Toelupe (who was the
    target of the investigation), that he should flee the
    jurisdiction before he could be arrested; id. at *7-8;

-the late disclosure of photographs shown to Mr. Gatoloai for
    purposes of identifying various defendants; id. at *7;

-the failure to produce coded e-mail correspondence between
    John Tai, who was in custody at the Federal Detention Center
    in Honolulu ("FDC"), and Agent Chambers until after Agent
    Chambers completed his trial testimony; id. at *8-9;

-allowing John Tai to contact Walter Dominguez directly to try to
    persuade him to cooperate with the Government;[7] id. at *9;

_____

    [7] For example, the 3/17/14 Order noted that, on
April 3, 2013, Agent Chambers wrote:

        Forgot to mention this yesterday but thought it
        was important to remind you that you have to be
        careful when working on the dreamworks project.
        That company is represented by their own legal
        team and we have to work through them to get
        things done.  You can have personal discussions
        regarding the project but nothing official from
        the production team. . . .

2014 WL 1091715, at *9 n.2 (alteration in 3/17/14 Order) (quoting
Second Motion to Dismiss, Decl. of Lynn E. Panagakos ("Panagakos
Decl."), Exh. 7 at 25).  Later that day, John Tai wrote:

        Yes, I've kept all details regarding script and
        new developments undisclosed . . . my approach on
        DreamWorks are [sic] more bringing to realization
        the need to look at this matter as a changing
        point for the better (by revamping the characteron
        [sic] their own term), nothing was disclosed
        regarding moving forward until they make their own
        commitment . . . I just wanted you and the team to
        know in the event that they do.

Id. at *8-9 (quoting Panagakos Decl., Exh. 7 at 4 (some
alterations in original)).  Exhibit 7 was filed in a separate
                                            (continued...)

-producing a computer disc of <u>Giglio</u> material on November 8, 2013
    that was insufficient and after the court-ordered
    October 30, 2013 deadline; <u>id.</u>; and

-the failure to make timely productions of the following
    materials during discovery - a written report of
    Daniel Fola's oral statement, subscriber information for the
    two target telephones, a written summary of the testimony
    and qualifications of the Government's expert witness
    regarding forensic chemistry, the qualifications of the
    Government's expert witness regarding the Samoan language,
    and photographs shown to witnesses during interviews; <u>id.</u>

After analyzing each of the alleged violations, this Court concluded that "the Government has been sloppy, inexcusably tardy, and almost grossly negligent in meeting its discovery obligations. The Government has committed almost all of the discovery violations alleged by Defendants." <u>Id.</u> at *10. However, this Court could not "conclude that the Government acted flagrantly, willfully, and in bad faith," and it found that "the Government's evidence is robust against several defendants." <u>Id.</u> at *10-11 (citation and internal quotation marks omitted). Thus, although it found that Defendants were entitled to a remedy, this Court also concluded that "lesser, but still significant, sanctions can be imposed to address the injustice caused by the Government's misconduct." <u>Id.</u> at *11. This Court ordered the

---

[7](...continued)
docket number from the Second Motion to Dismiss; it is dkt. no. 797.

At the time of the e-mail exchange between John Tai and Agent Chambers, it was well known to the Government that Dreamworkz Audio was the name of Walter Dominguez's business.

following sanctions:

> (1) the Government's witnesses [Jordan] Fonoti, Pulaa Gatoloai, and Agent Chambers shall be recalled, and Defendants will be permitted to cross-examine them regarding the withheld discovery; (2) Defendants shall be permitted to question the Government's witnesses John Tai and Agent Pa regarding the withheld discovery; (3) a jury instruction shall be given to the jury regarding why these witnesses are being recalled and explaining that the recalls are due to the Government's misconduct; (4) Defendants shall each be permitted to give, at his option, an opening statement after the Government rests its case; and (5) the Court will refer Assistant United States Attorney [("AUSA")] Jonathan Loo to the Department of Justice, Office of Professional Responsibility [("OPR")] regarding the misconduct in this matter.

Id.

## II.  **The Third and Fourth Motions to Dismiss**

In the Third and Fourth Motions to Dismiss, Defendants seek dismissal based upon further discovery violations that came to light after this Court issued its oral ruling on the Second Motion to Dismiss.  The motions also ask this Court to revisit the violations addressed in connection with the Second Motion to Dismiss so that it can consider the effect of the Government's misconduct as a whole.  The Third Motion to Dismiss addresses the following incidents:

-the failure to produce a report dated November 29, 2011 regarding the seizure of $32,190 from John Tai ("11/29/11 Seizure Report") until after he completed his testimony;

-the failure to produce a report dated December 16, 2013 regarding an interview on that date of John Tai by Agent Chambers and Special Agent Marc Mato ("12/16/13 Interview

Report") until after John Tai completed his testimony and
after the filing of the Second Motion to Dismiss;

-the failure to disclose, until January 13, 2014, "the existence
   of voluminous recordings of approximately 1000 telephone
   calls made by John Tai, Louis Tai, [and] Pulaa Gatoloai, as
   well as thousands of pages of emails, email logs, visiting
   records, etc. for almost all" Defendants; [Mem. in Supp. of
   Third Motion to Dismiss at 1-2;] and

-a week before the filing of the Third Motion to Dismiss, the
   Government "planned to call [Laita] Saimalu without
   disclosing a report which the government admits contained
   Giglio material[;]" [id. at 3].

On January 29, 2014, this Court orally denied the Third Motion to

Dismiss, but, as a sanction for the Government's repeated

discovery violations, struck John Tai's testimony. [Tr. Trans. -

Day 20 (1/29/14) ("Day 20 Trans."), filed 5/5/14 (dkt. no. 1257),

at 24-25.]

        Tootoo alleges that Defendants learned of even more

discovery violations after this Court's oral ruling on the Third

Motion to Dismiss. The Fourth Motion to Dismiss addresses the

following incidents:

-the untimely production of interview reports related to
   Mr. Gatoloai's Toelupe Cooperation, which Tootoo argues
   "reflect that Gatoloai repeatedly lied during his post-
   arrest statement[;]" [Fourth Motion to Dismiss at 4;]

-the untimely production of other "interview reports, agreements,
   motions, and transcripts of testimony [related to the
   Toelupe case] in the United States Attorney's Office's
   possession[;]" [id. at 5;] and

-Agent Chambers's filing of a declaration on February 3, 2014,
   stating that AUSA Loo was aware of Chambers's April 2, 2013
   e-mail to John Tai, which Tootoo argues shows that Loo "was
   intentionally and willfully misleading" when "he represented

[to defense counsel] that the government immediately told Tai to stop the Dreamworks Project[;]" [id. at 5-6].

This Court orally denied the Fourth Motion to Dismiss, and the joinders thereto, on February 11, 2014. [Day 25 Trans. at 144-45.]

## III. **The Verdicts and the Fifth Motion to Dismiss**

Ultimately, the jury deliberated on Counts 1, 6, and 11 through 18 of the Third Superseding Indictment as to Toilolo, Tootoo, Kaisa Tai, and Walter Dominguez. The jury returned its verdicts on March 7, 2014. [Dkt. nos. 1132 through 1132-3.] It returned verdicts of not guilty as to all counts against Tootoo and Kaisa Tai. [Dkt. nos. 1132-1, 1132-2.] As to Toilolo, the jury was unable to reach a unanimous verdict as to Count 1, and it returned a verdict of not guilty as to Count 6.[8] [Dkt. no. 1132.] As to Walter Dominguez, the jury returned verdicts of: guilty as to Count 1 and Counts 14 through 17; and not guilty as

---

[8] This Court declared a mistrial as to Count 1. [Minutes, filed 3/7/14 (dkt. no. 1131).] On March 10, 2014, this Court issued Toilolo's Judgment of Acquittal on Count 6. [Dkt. no. 1142.]

On April 10, 2014, Toilolo, Delanor Fola, Corniel, Osvaldo Dominguez, and Jackson were indicted in the Fourth Superseding Indictment. [Dkt. no. 1198.] Toilolo, Delanor Fola, Corniel, and Osvaldo Dominguez proceeded to trial ("the Second Trial"). The jury ultimately found Toilolo guilty of Count 1 of the Fourth Superseding Indictment. [Verdict, filed 3/24/15 (dkt. no. 1711).] However, any issues related to the Second Trial are not relevant to the Motions to Dismiss currently before this Court.

11

to Count 6 and Counts 11 through 13.  The jury was unable to
reach a unanimous verdict as to Count 18.[9]  [Dkt. no. 1132-3.]

A few weeks after the jury returned its verdicts,
Toilolo filed the Fifth Motion to Dismiss.  The motion does not
set forth any new incidents of prosecutorial misconduct, but it
reiterates the many discovery violations and other misconduct by
the Government.  Toilolo argues that the Court must evaluate the
incidents individually and cumulatively.  He contends that the
Government's conduct was flagrant and willful, or at least
reckless, and violated his due process rights.  He therefore
urges this Court to dismiss Count 1 because that is the only
remedy available to him.

## STANDARDS

The applicable standards for evaluating alleged
violations of Brady, Giglio, *Jencks*, and Rule 16, as well as the
standards for dismissal of an indictment based on outrageous
government conduct, are set forth in the Standard section of the
3/17/14 Order, which this Court incorporates by reference.  See
2014 WL 1091715, at *2-5.  In particular, the order recognized
that there are two theories that can support dismissal of an
indictment with prejudice: "'[First, a] district court may

---

[9] On March 10, 2014, this Court issued Walter Dominguez's
Judgment of Acquittal on Counts 6, 11, 12, and 13.  [Dkt. no.
1145.]  The Government elected not to retry him on Count 18, and
this Court issued the Order for Dismissal on March 11, 2014.
[Dkt. no. 1147.]

dismiss an indictment on the ground of outrageous government conduct if the conduct amounts to a due process violation. [Second, i]f the conduct does not rise to the level of a due process violation, the court may nonetheless dismiss under its supervisory powers.'" Id. at *4 (quoting United States v. Chapman, 524 F.3d 1073, 1084 (9th Cir. 2008) (alterations in Chapman)).

The Ninth Circuit has stated that:

> In order to show outrageous government conduct, defendants must show conduct that violates due process in such a way that it is "so grossly shocking and so outrageous as to violate the universal sense of justice." United States v. Restrepo, 930 F.2d 705, 712 (9th Cir. 1991) (quoting United States v. O'Connor, 737 F.2d 814, 817 (9th Cir. 1984)) (internal quotation marks omitted). The defense is therefore "limited to extreme cases in which the government's conduct violates fundamental fairness." [United States v.] Gurolla, 333 F.3d [944,] 950 [(9th Cir. 2011)].

United States v. Stinson, 647 F.3d 1196, 1209 (9th Cir. 2011). In addition, "[a] court may dismiss an indictment under its supervisory powers only when the defendant suffers substantial prejudice, and where no lesser remedial action is available." Chapman, 524 F.3d at 1087 (citations and internal quotation marks omitted).

## DISCUSSION

In the Motions to Dismiss, Defendants argue that the repeated discovery abuses by the Government warrant dismissal of

the charges against them in the Third Superseding Indictment with prejudice.  They argue that this Court has the authority to do so based on the violation of their due process rights, under its supervisory powers, or on both grounds.  See, e.g., Joint Reply at 2 n.1.  This Court will evaluate each of the new incidents alleged in the instant Motions to Dismiss - as well as the cumulative effect of all of the incidents in this case - under both theories.

## I.    **John Tai**

John Tai testified on December 18, 19, and 20, 2013 and on January 9 and 10, 2014.  He testified that Walter Dominguez supplied him with the drugs which he distributed in Hawai`i through his family members and associates.  John Tai also described the different processes that they used to transport drugs and the drug proceeds to and from Hawai`i.

### A.    **11/29/11 Seizure Report**

The Third Motion to Dismiss states that the Government did not produce the 11/29/11 Seizure Report until January 13, 2014, after John Tai concluded his trial testimony. [Mem. in Supp. of Third Motion to Dismiss at 1.]  The 11/29/11 Seizure Report states that:

> On October 14, 2011, at approximately 1100 hours, Gertrude SALE (PROTECT IDENTITY), the commonlaw wife of John TAI, met with Homeland Security Investigations, SAC/HL Special Agents . . . .
> SALE gave the agents $32,190 in United States currency.  SALE explained that the money belonged

14

to her common law husband, John TAI, and that the money was obtained from the sale of narcotics.

[Third Motion to Dismiss, Decl. of Cliff Hunt, Exh. A at 3.]

The Government concedes that the production of the 11/29/11 Seizure Report was untimely. However, it argues that the untimely disclosure was not prejudicial because other documents containing information about the seizure were provided on May 22, 2012 to Reginald Minn, Esq., who was Kaisa Tai's counsel at the time. [Mem. in Opp. to Third Motion to Dismiss at 2-3.] The Government points to the following documents that were among the materials produced to Mr. Minn:

-the Application and Affidavit for Search Warrant filed on March 28, 2012 in United States v. 92-1053 Aliinui Drive, MA 12-0333 BMK ("MA 12-331 Warrant Application"); [id., Exh. 3;]

-the Criminal Complaint in MA 12-0331 BMK, filed on March 27, 2012 ("MA 12-331 Complaint"); [id., Exh. 4;] and

-photographs and a transcript of a recorded conversation on October 14, 2011 between Mr. Chung and a female confidential source at the Kapolei Starbucks ("Starbucks Meeting"); [id., Exh. 5.]

Both the MA 12-331 Warrant Application and the MA 12-331 Complaint state that, on or about October 14, 2011, a confidential source surrendered $32,190 to federal agents. The source stated the money was from the sale of illegal drugs in Hawai`i by "a drug trafficking organization headed by John TAI" ("Tai DTO"). [MA 12-331 Warrant Application, Aff. of Amy Garon at ¶¶ 17, 24; MA 12-331 Complaint, Aff. in Supp. of Criminal

Complaint at ¶¶ 6, 13.] The Government states that the MA 12-331 Warrant Application sought a search warrant for Mr. Chung's two Kapolei apartments. [Mem. in Opp. to Third Motion to Dismiss at 2-3.] The MA 12-331 Complaint charged Mr. Chung and others with conspiracy to possess, with intent to distribute, fifty grams or more of methamphetamine, its salts, isomers, and salts of its isomers. [MA 12-331 Complaint at 1.]

According to the time stamps on the transcript of the Starbucks Meeting, the meeting began at 7:09 p.m. and lasted a little over twenty minutes. [Mem. in Opp. to Third Motion to Dismiss, Exh. 5 at 260, 266.] Thus, both the Starbucks Meeting and the meeting between the confidential source and the agents occurred on the evening of October 14, 2011. Although none of the three documents that the Government relies upon identifies the confidential source by name, the Government did provide Mr. Minn with a picture of the female confidential source, and her identity is apparent from the context of her conversation with Mr. Chung. She speaks on behalf of "Vai."[10] See, e.g., id. at 261 ("I'm happy that you do that. Cause what I do . . . . [i]s I communicate that to Vai."); id. (she states that "Vai wants to make sure" he has been good to Mr. Chung); id. at 265 ("[E]verybody's just trying to step in and do Vai's job.

---

[10] John Tai is also known as "Vai." See, e.g., Superseding Indictment at 1.

Everybody wants do [sic] it, but I'm the one that's running it."). In addition, she states that she wonders, "[w]here does all this [money that Mr. Chung pays him] go when Vai brings it home, cause I never see it," [<u>id.</u> at 263,] and that Vai's "main concern is me and the kids," [<u>id.</u> at 265]. Mr. Chung and the confidential source also discuss Mr. Chung's debt to John Tai and the fact that he has previously paid, and was paying at that meeting, part of that debt through her.

> LC: Out of five, out of the five, I owed one more. **I owe one million, hundred and forty dollars which I have now, right now right dea.** So that whole deal from when Vai went away (UI). Once, once (UI). A ninety-nine (UI) from today, and the fifty-seven that I hit you. So ninety-nine, (UI) times four for each. So ninety-nine plus thirty, what would that be? That would be hundred-twenty-nine. Hundred-twenty-nine. One-two-nine times four, (UI).
>
> CS: Oh, that's Vai's big payment? That's Vai's . . . .
>
> LC: (UI)
>
> CS: Five hundred thousand?
>
> LC: Yeah, yes.
>
> CS: No way.
>
> LC: So, out of the one-seventy-our, I think one-seventy-four times twenty-four, wait gotta redo this, excuse me. One-seventy-four times twenty-four (UI). Hundred-seventy-four times (UI) . . . Six-hundred sixty-nine, I mean six hundred eighty-six excuse me from the one-seventy-four. **I dunno how much I could give you.** (UI) five hundred somethin?

CS:  You already gave me five-hundred.

LC:  (19:19:06) Five hundred?  And den had one
     nadda ninety.  So I dunno if you got that
     yet.  Did you get this?

CS:  No.

[Id. at 261-62 (some alterations in original) (emphases added).]

Although Ms. Sale did not ultimately testify at trial,
at the time of the pre-trial disclosure deadlines, she was still
a potential Government trial witness.  See Gov't Amended Witness
List, filed 11/13/13 (dkt. no. 662), at 4.  The Government should
have disclosed the 11/29/11 Seizure Report by the Giglio
disclosure deadline because the fact that Ms. Sale was receiving
drug proceeds on behalf of John Tai after his arrest.  See
3/17/14 Order, 2014 WL 1091715, at *3 ("A Giglio violation occurs
where the prosecution suppresses evidence that impeaches a
witness's credibility." (citing Giglio, 405 U.S. at 154)).  At
the very least, the Government should have produced the report as
Rule 16 evidence because it could have been helpful to the
development of the defense.  See United States v. Budziak, 697
F.3d 1105, 1111 (9th Cir. 2012) ("Evidence is 'material' under
Rule 16 if it is helpful to the development of a possible
defense." (citation omitted)).

Although it is clear that the Government should have
disclosed the 11/29/11 Seizure Report, this Court cannot find
that the suppression of the report was prejudicial.  See United

18

States v. Olsen, 704 F.3d 1172, 1181 (9th Cir. 2013) ("The three elements of a claim for a Brady violation are that the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." (brackets, citations, and quotation marks omitted)); 3/17/14 Order, 2014 WL 1091715, at *3 (noting that the three elements of a Brady violation are also necessary to establish a Giglio violation (citing United States v. Kohring, 637 F.3d 895, 901 (9th Cir. 2011))). Reading the MA 12-331 Warrant Application, the MA 12-331 Complaint, and the transcript of the Starbucks Meeting together, it can be reasonably inferred that Ms. Sale was the confidential source who surrendered $32,190 of proceeds from the Tai DTO to federal agents on October 14, 2011. Because information regarding Ms. Sale's surrender of drug proceeds was already available to defense counsel, this Court cannot find that, if the Government had produced the 11/29/11 Seizure Report by the Giglio deadline, it would have changed the outcome of the case for Toilolo or Walter Dominguez. Cf. Kohring, 637 F.3d at 902 ("Evidence is prejudicial or material 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" (quoting United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct.

3375, 87 L. Ed. 2d 481 (1985))).  While the failure to produce

the 11/29/11 Seizure Report in a timely manner is yet another

inexcusable violation of the Government's discovery obligations,

this Court CONCLUDES that Defendants are not entitled to

sanctions based upon the late disclosure of that report.

**B.**    **12/16/13 Interview Report**

As previously noted, the coded e-mail correspondence

between John Tai and Agent Chambers, and the Government's failure

to disclose the e-mails to Defendants, were significant subjects

of the Second Motion to Dismiss.  In the 3/17/14 Order, this

Court noted that the Government produced copies of the

correspondence to Defendants on December 13 and 16, 2013.  2014

WL 1091715, at *8.  The December 13 production was apparently the

set of e-mails that Agent Chambers had printed during the course

of the correspondence, and the December 16 production was a more

complete set that Agent Chambers obtained from FDC.  [Panagakos

Decl., Exh. 7 at 1 (e-mail dated 12/16/13 from Jonathan Loo

transmitting additional e-mails received from FDC); id. at 2

(e-mail dated 12/13/13 from Loo transmitting e-mails); Gov't Mem.

in Opp. to Second Motion to Dismiss, filed 12/30/13 (dkt. no.

813), Exh. B (Decl. of James A. Chambers dated 12/30/13

("Chambers 12/30/13 Decl.")) at ¶¶ 51-52 (discussing printing his

e-mails with John Tai).]

The 12/16/13 Interview Report states that it "documents information provided by John TAI regarding the e-mails that were not previously provided." [Third Motion to Dismiss, Exh. B at 3.] The Government, however, did not produce the 12/16/13 Interview Report to Defendants until January 13, 2014. [Mem. in Supp. of Third Motion to Dismiss at 1.] Further, unlike with the 11/29/11 Seizure Report, the Government had not previously disclosed other documents which contained the same information as the 12/16/13 Interview Report. In fact, even though he had conducted the interview and written the report by that time, Agent Chambers did not include any information about the December 16, 2013 interview in his December 30, 2013 declaration. The most recent interview with John Tai that he described was a July 26, 2013 interview that he and Special Agent Benjamin Bumanglag conducted. [Chambers 12/30/13 Decl. at ¶ 108.] The interview of John Tai by Agents Mato and Chambers occurred two days before John Tai began his trial testimony and almost three weeks after Agent Chambers completed his testimony. Agent Mato testified approximately six weeks after the interview. The interview was also contemporaneous with the disclosure of the coded e-mails to Defendants. The fact that this interview took place and the fact that it was not immediately disclosed to defense counsel is potential impeachment material because Defendants could question all three witnesses about whether

Agents Chambers and Mato attempted to influence John Tai's testimony about the e-mails, and other areas, or at least to ensure that his testimony was consistent with their testimony.

Moreover, the 12/16/13 Interview Report contains information that defense counsel did not have – and could not obtain from other discovery – because it includes John Tai's and Agent Chambers's explanations of their intentions behind many of their coded e-mails and their interpretations of many of the coded e-mails they received. For example, the 12/16/13 Interview Report notes that, on March 4, 2013, John Tai wrote:

> Haven't had any new updates regarding new script writer – we are still going along with what we have discussed until further notice. Wanted to ask if you think Mr. CEO who recently joined the club could be a potential part of the movie project giving his current situation and the ability that he we [sic] have in making contact with leads. Just a thought – I know we discussed his role – and I wanted to put it out there as an option. I'm willing to have a sit down with him if we need to. . . .

[12/16/13 Interview Report at 4 (internal quotation marks omitted).] The report also states:

> According to J. TAI, the information he was trying to convey was:
>
> The "new script writer" is [KENT] STONE. TAI was informing SA Chambers that he is not giving STONE any information and there are no updates from what was discussed during their previous meeting. "Mr. CEO" is Delano [sic] FOLA (FOLA). TAI is asking SA Chambers about FOLA since he was

recently incarcerated at FDC and about whether
FOLA wants to cooperate with the government.

[Id.] Further, it states:

> SA Chambers responded to J. TAI's e-mail with:
>
> Sup bro-
> Yeah, ive [sic] been talking it over with the
> producers and some of the role players. We'll see
> what we can do. It might be tough since there are
> two different production companies involved and
> theres [sic] always a possibility of a problem.
> I'll keep working on it. . . .
>
> Agent Note: SA Chambers is informing John TAI that
> he is looking into the STONE cooperation situation
> but that it doesn't look promising. SA Chambers
> did not understand that TAI's reference to
> "Mr. CEO" was Delanor FOLA and thought he was
> still discussing STONE.
>
> According to J. TAI, he interpreted this email to
> mean:
>
> SA Chambers advised and consulted with the
> prosecutors and Agents involved with STONE's case
> and SA Chambers is working on it. It might be
> difficult because they are dealing with two
> separate agencies. J. TAI also stated that he
> could tell that SA Chambers did not know who TAI
> was referencing to when he mentioned "Mr. CEO"
> because SA Chambers did not reference it.

[Id. (some internal quotation marks omitted).] The report

discusses other e-mails regarding Stone, as well as the

"Dreamworkz project" and John Tai's discussions with

Walter Dominguez. [Id. at 5-7.]

This Court found in the 3/17/14 Order that "the e-mail

communications should have been produced to Defendants as *Jencks*

and Giglio material. John Tai's e-mails are his written

23

statements.  Further, Agent Chambers's e-mails impact his credibility and constitute _Giglio_ material."  2014 WL 1091715, at *9.  Similarly, the 12/16/13 Interview Report, which memorializes an interview discussing the coded e-mail communications, also should have been produced to Defendants as _Jencks_ and _Giglio_ material.  The Court therefore concludes that the Government's failure to produce the report immediately after it was prepared, and certainly before John Tai's cross-examination, violated its obligations under _Jencks_ and _Giglio_, and the violations were prejudicial.

C.  **Communications at FDC**

On January 13, 2014, AUSA Thomas Muehleck sent a letter to Defendants' counsel stating that the Government determined that ICE "previously received" various computer discs from FDC ("1/13/14 Letter").  [Third Motion to Dismiss, Exh. C at 1-2.] As to John Tai, there were: recordings of 22 non-legal telephone calls between June 1, 2011 and August 5, 2011, recordings of 269 non-legal telephone calls between August 1, 2011 and December 8, 2011, and recordings of 302 non-legal telephone calls between December 18, 2011 and May 2, 2012; "[f]inancial records, e-mail contacts, email and visiting records" between June 1, 2011 and August 5, 2011; "[f]inancial, phones [sic], email and visiting information" between August 5, 2011 and May 2, 2012; and e-mails to and from John Tai, as well as his e-mail contacts, for

August 1, 2011 to December 8, 2011.[11]  [Id. at 1-2.]  AUSA

Muehleck stated that, based on the Government's "limited review

of these items, [they] believe that these items contain personal

conversations with family members" and that the Government was

making copies of the discs for distribution to all defense

counsel.  [Id. at 2.]

The Government provided the John Tai materials to

defense counsel on January 14, 2014.  [Joint Reply, Decl. of

Harlan Y. Kimura ("Kimura Decl."), Exh. F (letter dated 1/14/14

to defense counsel from AUSA Muehleck).]  By way of four letters

dated January 20, 2014 to defense counsel, [Kimura Decl.,

Exhs. K-N,] the Government identified specific telephone calls

and e-mails between John Tai and Ms. Sale that "contain[ed]

possible impeachment or Giglio material."  Id., Exh. K at 1-2;

see also id., Exh. L at 1, Exh. M at 1, Exh. N at 1.  The

telephone calls and e-mails include:

-an October 3, 2011 call in which John Tai says that "he
    questions what he is doing[;]" [Kimura Decl., Exh. K at 3;]

-an October 13, 2011 call in which Ms. Sale says that she lied to
    agents about money; [id.;]

-an October 22, 2011 call in which they discuss communication
    within the DTO; [id. at 4;]

---

[11] This Court will refer to all of the recorded telephone
calls involving John Tai referenced in the 1/13/14 Letter as the
"John Tai FDC Recordings," and all of the e-mails involving
John Tai referenced in the 1/13/14 Letter as the "John Tai FDC
E-mails."

-a November 4, 2011 call in which Ms. Sale says that "'we are
     doing everything as we used to do it[;]'" [id.;]

-a December 7, 2011 call in which they discuss their outstanding
     drug debt owed to Walter Dominguez; [id. at 6;]

-a February 9, 2012 call in which Ms. Sale says that "people are
     coming around asking for money," but she does not want
     Walter Dominguez to know; [Kimura Decl., Exh. L at 4;]

-multiple calls in which she discusses working with the
     "Uncles;"[12] see, e.g., id. at 5-7;

-a March 22, 2012 call in which Ms. Sale says Mr. Talia "is ready
     take over[;]" [id. at 7;]

-multiple calls in which she says Mr. Talia or Mr. Chung was
     meeting with one of her "Uncles;" see, e.g., id. at 7-9;

-a March 28, 2012 call in which Ms. Sale says that
     Walter Dominguez's wife "is not budging and that
     [Ms. Sale's] Uncles might talk to her" and John Tai responds
     that he hopes Dominguez "does the right thing[;]" [id. at
     9;]

-a March 29, 2012 call in which Ms. Sale said that the Fuamatus
     were not cooperating and were "looking at serving regular
     time," and that her Uncles believe she and John Tai had
     money hidden (but which she denied); [id. at 9-10;]

-a March 31, 2012 call in which they discuss whether two persons
     who were sent to ask questions about Ms. Sale were sent by
     Walter Dominguez; [id. at 11;]

-two calls during April 2012 during which they discuss trying to
     get a particular attorney off of the case because they
     believe he is leaking information; [Kimura Decl., Exh. M at
     2-3;]

-calls during May 2012 discussing whether Ms. Sale and John Tai
     are receiving the assistance that they deserve for their
     cooperation with the Government; [id. at 3-4;]

--------

     [12] Ms. Sale's "Uncles . . . are purported to be Homeland
Security Investigation (HSI) Agents." [Kimura Decl., Exh. L at
4.]

-an October 19, 2011 e-mail in which John Tai says that he heard his "brother Ina" wants to take his case trial and that Ina's brother-in-law, who testified against Tai before the grand jury "stated that he will retract his statements come trial," but Tai did not believe that because "he testified against his uncle [and] he would do the same to" Tai; [Kimura Decl., Exh. N at 3;] and

-an April 18, 2012 e-mail in which John Tai talks about his conversation with "bro Walt[;]" [id. at 8].

These communications clearly establish that John Tai and Ms. Sale had on-going discussions about the case, including their cooperation with the Government and the potential cooperation of some of Tai's co-defendants.  They are also potential impeachment evidence because they indicate possible coordination of John Tai's and Ms. Sale's statements, and they also suggest that Tai and Ms. Sale continued to be involved in the DTO even after they began cooperating with the Government.  Thus, the Court CONCLUDES that: (1) because of these clear examples of *Jencks* and Giglio material, the Government was required to produce all of the John Tai FDC Recordings and all of the John Tai FDC E-mails to Defendants;[13] (2) the Government's failure to produce these materials by the applicable deadlines, and certainly before

----

[13] This Court emphasizes that the Government was required to produce **all** of the recordings and e-mails - not only the ones that it identified as possible Giglio and *Jencks* material - because Defendants were entitled to examine all of them to determine if there was other Giglio and *Jencks* material in addition to the potential Giglio and *Jencks* material that the Government identified.

John Tai's cross-examination, violated its obligations under *Giglio* and *Jencks*; and (3) the violations were prejudicial.

### D.   **Other John Tai FDC Records**

Defendants also described the other FDC records referenced in the 1/13/14 Letter:  John Tai's e-mail contact lists; financial records and logs; phone contact lists; e-mail logs; visitor logs; and time lines and graphs depicting this information (collectively "John Tai FDC Logs").  [Kimura Decl., Exh. I (Inventory of Documents/CD's Received from United States Government dated 1/21/2014 ("January 2014 Inventory")) at 1-3, 5.[14]]  Defendants, however, did not attach any of these documents, and this Court cannot determine from the brief descriptions in the January 2014 Inventory whether the Government's failure to produce any of these materials was a violation of *Brady*, *Giglio*, *Jencks*, or Rule 16.  This Court must therefore CONCLUDE that Defendants are not entitled to sanctions based upon the late disclosure of the John Tai FDC Logs.

### E.   **Appropriate Sanction**

This Court has concluded that the Government's suppression of the 12/16/13 Interview Report, the John Tai FDC Recordings, and the John Tai FDC E-mails violated *Giglio* and/or

---

[14] Len Oyama of LTO Enterprises, LLC ("LTO") prepared the January 2014 Inventory.  Toilolo's counsel retained Mr. Oyama and LTO pursuant to court orders and the Criminal Justice Act. [Kimura Decl. at ¶ 8.]

*Jencks*. Defendants are clearly entitled to a remedy. The issue before this Court is what remedy is appropriate under the circumstances of this case.

Defendants argue that dismissal is the only appropriate remedy because recalling witnesses is insufficient to remedy the failure to make timely production of the impeachment evidence, particularly because some of the evidence was not preserved and was never made available to Defendants. As to John Tai, Defendants cite the "purged Chambers/Tai emails."[15] [Joint Reply at 14.] Further, Defendants argue that referring AUSA Loo to OPR is not sufficient to deter similar misconduct.

Defendants cite <u>Chapman</u>, 524 F.3d at 1087, in support of their position that "dismissal is necessary under the Court's supervisory powers, because no lesser sanction is available" in this case. [Joint Reply at 13.] This Court, however, finds that <u>Chapman</u> does not control the outcome of the Third Motion to Dismiss. In <u>Chapman</u>, the Ninth Circuit held that the district court did not **abuse its discretion** in dismissing the indictment

---

[15] The Court notes that Agent Chambers has stated that:

> The only e-mail not preserved by the FDC was an e-mail I sent to John TAI on May 23, 2013, instructing him to stop e-mailing me. I did not print out the e-mail at the time and I do not believe that John TAI ever received the e-mail because he was in the [Special Housing Unit] at the time.

[Chambers 12/30/13 Decl. at ¶ 52.]

in that case. It did not hold, for example, that dismissal was
required as a matter of law. Its analysis clearly indicates that
the district court has the discretion to determine what sanction
is appropriate, and usually the appropriate remedy is something
short of dismissal. For example, the Ninth Circuit stated:

> Brady violations are just like other
> constitutional violations. Although **the
> appropriate remedy will usually be a new trial**,
> see Giglio, 405 U.S. at 153-54, 92 S. Ct. 763
> (explaining when the suppression of material
> evidence or the solicitation of false testimony
> justifies a new trial), a district court **may
> dismiss** the indictment when the prosecution's
> actions rise, as they did here, to the level of
> flagrant prosecutorial misconduct. . . .
>
>         . . . .
>
> A court **may dismiss** an indictment under its
> supervisory powers only when the defendant suffers
> "substantial prejudice," United States v. Jacobs,
> 855 F.2d 652, 655 (9th Cir. 1988), and where "**no
> lesser remedial action is available**," [United
> States v.] Barrera-Moreno, 951 F.2d [1089,] 1092
> [(9th Cir. 1991)]. . . .

Chapman, 524 F.3d at 1086-87 (emphases added).

Chapman is similar to the instant case in that the
government failed to disclose a significant amount of Brady and
Giglio material until the trial was already under way. See id.
at 1079-80. However, the district court's response to the
prosecutor's misconduct in Chapman distinguishes it from the
instant case. After a hearing, the district court declared a
mistrial and dismissed the jury. Although it stated that it was

inclined to dismiss the indictment, the district court deferred
ruling on the motion to dismiss until the parties briefed the
matter. Approximately three weeks later, the district court held
a hearing on the motion to dismiss and ultimately granted the
motion to dismiss. Id. The district court concluded that
dismissal was the only available sanction that would avoid
prejudice to the defendants, and the Ninth Circuit held that the
ruling was not an abuse of discretion. Id. at 1087. In Chapman,
because the district court had already declared a mistrial when
it considered the motion to dismiss, dismissal was the only
available means to cure the prejudice to the defendants. The
district court could not fashion other remedies, such as striking
witness testimony.

        In the instant case, in its oral ruling denying the
Third Motion to Dismiss, this Court struck the testimony of
John Tai - in its entirety - and struck all exhibits entered into
evidence through his testimony. This Court also ruled that the
recorded conversations which John Tai identified could not be
entered into evidence unless the Government presented another
witness who could identify the voices in the recording. [Day 20
Trans. at 24-25.] Further, this Court instructed the jury that:

            Evidence was recently turned over by the
            government in violation of an order of this court
            and the prosecution's constitutional obligation.
            The government withheld evidence as to certain
            witnesses, some of whom have already testified. I
            have sanctioned the government for prosecutorial

31

misconduct.  As a result, I am instructing you as
follows:

         . . . I am striking the testimony of John Tai
    and you may not consider his testimony, or any
    inferences that could have been drawn from his
    testimony, for any purpose or as to any defendant.

[Tr. Trans. - Day 26 (2/12/14), filed 5/5/14 (dkt. no. 1263), at

82.]

         The striking of John Tai's testimony was a significant

sanction.  John Tai was the leader of the drug trafficking

organization, and he gave extensive testimony about how it

operated.  He testified that Toilolo, Tootoo, Kaisa Tai,

Daniel Fola, and Walter Dominguez were all part of the

organization.  For example,

-John Tai testified that Walter Dominguez was the source of the
    methamphetamine that he distributed in Hawai`i beginning in
    2007, and Dominguez was responsible for getting the
    methamphetamine to Hawai`i.  [Tr. Trans. - Day 10 (12/18/13)
    ("Day 10 Trans."), filed 5/5/14 (dkt. no. 1247), at 131-34.]
    Walter Dominguez continued to supply drugs for distribution
    in Hawai`i even after Tai's arrest.  [Tr. Trans. - Day 12
    (12/20/13 AM Session) ("Day 12 AM Trans."), filed 5/5/14
    (dkt. no. 1249), at 6-8.]

-In 2008, Toilolo and Tootoo began distributing methamphetamine
    for John Tai in Hawai`i.  [Id. at 143-44.]  He identified
    Toilolo as one of his "main guys," and stated that Toilolo
    was responsible for running the drug operation in Hawai`i
    from 2008 into the later part of 2009.  [Tr. Trans. - Day 11
    (12/19/13) ("Day 11 Trans."), filed 5/5/14 (dkt. no. 1248),
    at 21-23.]

-During mid-2007, Tootoo traveled with John Tai between Hawai`i
    and California to transport drug proceeds.  [Day 10 Trans.
    at 155.]

-Delanor Fola was John Tai's "main guy" through the middle of
    2007.  [Day 11 Trans. at 21.]  Tootoo was one of the main

32

guys under Delanor Fola, and Delanor Fola's brother,
Daniel Fola, would run errands, collecting money and
delivering product. [<u>Id.</u> at 26-27.] John Tai kept Tootoo
in the organization even after Tai was no longer working
with Delanor Fola. [<u>Id.</u> at 31.]

-John Tai's brother, Kaisa Tai, was involved in the organization
as a drug distributor, and he was part of its distribution
of cocaine in Hawai`i in 2010. [<u>Id.</u> at 79-82.] John Tai
increased Kaisa Tai's involvement and reduced Toilolo's and
Tootoo's involvement because they had become targets of law
enforcement investigations. [<u>Id.</u> at 83-86.]

John Tai also identified the voices on multiple recorded

conversations between Toilolo and Tootoo, and multiple recorded

conversations between Tootoo and Daniel Fola.[16]  He verified that

the accompanying transcripts corresponded to the recordings.

[Day 12 AM Trans. at 13-23, 37-68.]  The Government identified

these recordings as calls from the wiretap on Tootoo's phone.

The calls occurred on various dates between June 2009 and

August 2009.  [Gov't Second Amended Exhibits List, filed 11/20/13

(dkt. no. 709), at 6-8.]  After this Court struck John Tai's

testimony, the Government did not present any other witness to

identify the voices on the recordings, and therefore it was not

able to enter those recordings into evidence.

        This Court therefore finds that striking John Tai's

testimony was a severe sanction that was sufficient to both cure

the prejudice to Defendants and deter future misconduct by the

_____

        [16] John Tai testified regarding Exhibits 503, 519, 601, 603,
604, 607, 611-614, 616-626, 630, 631, 633, and 635-637.

Government's attorneys.[17] Thus, because a lesser (although still significant) sanction was available and was ordered by this Court, this Court therefore CONCLUDES that dismissal is not necessary to address the prosecutorial misconduct regarding John Tai. Although the Government's conduct was inexcusable, this Court cannot finding that the suppression of the John Tai materials rose to the level of a due process violation. Further, this Court declines to exercise its supervisory powers to dismiss the Third Superseding Indictment.

## II. Agent Chambers's Declaration

On February 3, 2014, the Government filed its Memorandum in Opposition to Defendants' Motion to Strike Special Agent James Chambers' Testimony.[18] [Dkt. no. 966.] Exhibit A to that memorandum in opposition is the Declaration of

---

[17] The striking of John Tai's testimony undoubtedly contributed to: the Government's concession that it did not carry its burden of proof as to all counts against Akana and Daniel Fola and as to Counts 2 through 5, and 7 through 10 against the other Defendants; see Order Granting in Part and Denying in Part Defendants Fouina C. Toilolo, Aloalii Tootoo, Kaisa Tai and Dominguez's Motions Pursuant to Rule 29, Fed. R. Crim. P., and Granting Defendant Harry Akana's and Defendant Daniel Fola's Motion Pursuant to Rule 29, Fed. R. Crim. P., filed 2/13/14 (dkt. no. 1015), at 1 (noting the Government's concession); and the jury's not guilty verdicts as to Tootoo and Kaisa Tai.

[18] On January 30, 2014, Toilolo, Tootoo, and Akana filed a Joint Motion to Strike Special Agent Chambers' Testimony. [Dkt. no. 950.] Daniel Fola and Kaisa Tai filed joinders in the motion on January 31, 2014. [Dkt. nos. 951, 953.] This Court orally denied the motion on February 4, 2014. [Minutes (dkt. no. 982).]

James A. Chambers, dated February 3, 2014 ("Chambers 2/3/14

Declaration").  The Fourth Motion to Dismiss argues that the

Chambers 2/3/14 Declaration shows that AUSA Loo "was

intentionally and willfully misleading" when "he represented [to

defense counsel] that the government immediately told [John] Tai

to stop the Dreamworks Project."  [Fourth Motion to Dismiss at 5-

6.]

Agent Chambers stated that he "printed out John Tai's

initial e-mail to [him] on April 2, 2013, concerning the

'DreamWorks' project. . . .  [T]his is the e-mail that [he]

re-read the following day and showed to AUSA Loo and [his]

supervisor at the time, Christopher Kobayashi, on April 3,

2013."[19]  [Chambers 2/3/14 Decl. at ¶ 9.]  Agent Chambers stated

---

[19] On April 2, 2013, John Tai wrote to Agent Chambers:

> Just wanted to let you know that I've been working
> on the DreamWorks project, bringing to life his
> character that have [sic] hindered the story line
> from coming alive.  My hope is that identifying
> the nature of the beast within, and making one
> realize the folly of his way will be fruitful at
> the end - and the deliverance of true regeneration
> regarding the main character will lead all to
> follow in agreement. . . .  God willing the new
> approach for our DreamWorks character will be in
> agreement with our production team when the time
> comes. . . .

[Panagakos Decl., Exh. 7 at 27.]  Later that day, Agent Chambers
responded, stating, *inter alia*, "I am hopeful that this project
will be a big success so that it may continue to benefit you and
your family."  [Id.]  This exchange preceded the e-mail exchange
quoted *supra* note 8.

in his December 30, 2013 declaration that, when he first read John Tai's April 2, 2013 e-mail, he did not realize what John Tai was trying to tell him, and he did not understand that Tai was making contact with Walter Dominguez. According to Agent Chambers, his April 2, 2013 response referred to the overall investigation and stated that Chambers hoped John Tai's cooperation in general worked out well for Tai and his family. The next day, Agent Chambers read John Tai's April 2 e-mail again and showed it to his supervisor and to AUSA Loo. After they discussed the e-mail, Agent Chambers realized that John Tai might have been talking about Walter Dominguez. [Chambers 12/30/13 Decl. at ¶¶ 80-82.]

Chambers stated that, pursuant to AUSA Loo's instructions, he "e-mailed John Tai to tell him not to communicate with Walter Dominguez about the case." [Chambers 2/3/14 Decl. at ¶ 10.] Further, on April 4, 2013, Agent Chambers printed out the e-mail chain to show AUSA Loo that he followed Loo's instructions and that John Tai received his e-mail and understood the instructions. [Id.]

In the December 13, 2013 e-mail, which Tootoo argues was misleading, AUSA Loo stated: "John Tai, on his own, took it upon himself to try and contact Walter Dominguez in prison to get him to do the right thing. When we found out about it, we immediately told him to stop, as evidenced by Agent Chambers'

response to John Tai the next day." [Panagakos Decl., Exh. 1 at 2.[20]]

This Court finds that Agent Chambers's declarations do not support Tootoo's argument that AUSA Loo's December 13, 2013 e-mail was intentionally and willfully misleading. This Court therefore REJECTS his argument that the Chambers 2/3/14 Declaration is evidence of Government misconduct which warrants dismissal.

## III. **Laita Saimalu**

The Third Motion to Dismiss alleges that, a week before the filing of the motion, the Government "planned to call Saimalu without disclosing a report which the government admits contained Giglio material." [Mem. in Supp. of Third Motion to Dismiss at 3.] It is not clear whether Defendants are attempting to raise this as a distinct incident of prosecutorial misconduct which warrants dismissal or whether they merely cite it as another example of their general argument that "[t]he government's continued noncompliance . . . is flagrant." See id.

To the extent that Defendants seek dismissal based upon this incident, the Court denies the request. Although Mr. Saimalu was identified as a potential Government trial witness, see Gov't Amended Witness List at 4, he ultimately did

---

[20] Exhibit 1 was filed in a separate docket number from the Second Motion to Dismiss; it is part of dkt. no. 795.

not testify.  Further, Defendants did not attach - to either the Third Motion to Dismiss or the Joint Reply - the report which the parties apparently agree contained <u>Giglio</u> material regarding Mr. Saimalu.  There is insufficient evidence in the record to support a finding that the failure to produce the report was prejudicial to Defendants.  This Court therefore CONCLUDES that Defendants are not entitled to sanctions based upon the failure to disclose the report which contained <u>Giglio</u> material regarding Mr. Saimalu.

**IV.  <u>Pulaa Gatoloai</u>**

Mr. Gatoloai testified on December 6 and 10, 2013, and, he was recalled for further cross-examination on February 13, 2014.  The Third Motion to Dismiss argues that the failure to timely disclose Mr. Gatoloai's seventy-four recorded telephone calls, referenced in the 1/13/14 Letter, constitutes prosecutorial misconduct.  Further, the Fourth Motion to Dismiss argues that the failure to timely disclose various documents regarding the Toelupe Cooperation constitutes prosecutorial misconduct.

**A.  <u>FDC Communications</u>**

The 1/13/14 Letter disclosed the existence of seventy-four recordings of non-legal telephone calls that Mr. Gatoloai made from FDC between June 1, 2011 and August 5, 2011.  The Government provided Defendants' counsel with discs of these

recordings on January 14, 2014.[21]  On January 19, 2014, the

Government informed Defendants' counsel that certain of the calls

"may warrant your attention as possible Giglio/Brady material or

relate to his trial testimony or may contain information that

could be of assistance to the defense . . . ."  [Kimura Decl.,

Exh. J (letter to Defendants' counsel from AUSA Muehleck, with

attachment) at 1.]  The calls include:

-multiple calls, such as on June 9, 2011 and June 13, 2011, in
    which Mr. Gatoloai denies being involved or he states that
    he is only named because he knows the other defendants; [id.
    at 2;]

-a June 22, 2011 call with his wife, during which they talk about
    the fact that Toilolo is fighting the charges, and
    Mr. Gatoloai says that Toilolo cannot win and will end up
    serving forty years; [id. at 3;] and

-calls on July 16 and 17, 2011, during which Mr. Gatoloai
    indicates that his cooperation is also for Toilolo's
    benefit; [id.].

These calls clearly include statements that Mr. Gatoloai made

about this case.  They are also impeachment evidence,

particularly the ones in which he denies his involvement.  Thus,

the Court CONCLUDES that: (1) because of these clear examples of

Jencks and Giglio material, the Government was required to

produce all of the Gatoloai FDC Recordings to Defendants; (2) the

Government's failure to produce the Gatoloai FDC Recordings by

the applicable deadlines, and certainly before Mr. Gatoloai's

---

[21] This Court will refer to all of the recorded telephone
calls involving Mr. Gatoloai referenced in the 1/13/14 Letter as
the "Gatoloai FDC Recordings."

cross-examination, violated its obligations under <u>Giglio</u> and
<u>Jencks</u>; and (3) the violations were prejudicial.

## B. __Toelupe Cooperation Documents__

The Fourth Motion to Dismiss argues that "the
government's recent production of critical impeachment material
on Gatoloai, which had always been in the United States
Attorney's Office's possession[,]" warrants dismissal.  [Fourth
Motion to Dismiss at 2.]  The following materials regarding
Mr. Gatoloai are attached to the Fourth Motion to Dismiss as
examples of the Government's production:

-excerpts of an ICE report dated June 3, 2001 of a June 1, 2001
     interview, which indicates that AUSA Loo discussed
     Mr. Gatoloai's case with the AUSA who was handling it; [<u>id.</u>,
     Exh. 1;]

-a Federal Bureau of Investigation ("FBI") report dated
     December 12, 2000 of a December 11, 2000 interview; [<u>id.</u>,
     Exh. 2;]

-a FBI report dated July 25, 2001 of a July 18, 2001 interview;
     [<u>id.</u>, Exh. 3;]

-a FBI report dated August 16, 2001 of an interview on that date;
     [<u>id.</u>, Exh. 4;]

-a FBI report dated April 1, 2002 of a March 25, 2002 interview;
     [<u>id.</u>, Exh. 5;] and

-the Government's Motion for Downward Departure for
     Mr. Gatoloai's sentencing in CR 00-00484; [<u>id.</u>, Exh. 6].[22]

Tootoo argues that these exhibits establish that: AUSA Loo was

_____

[22] The Court will collectively refer to the materials – of
which the exhibits to the Fourth Motion to Dismiss are examples –
as the "Toelupe Cooperation Materials."

aware, since at least June 1, 2001, that the United States
Attorney's Office had impeachment material regarding Mr. Gatoloai
from the Toelupe Cooperation; Mr. Gatoloai lied repeatedly during
the Toelupe Cooperation, even after he had an agreement with the
Government which required him to tell the truth; the AUSA
handling the case informed Mr. Gatoloai in March 2002 that he was
facing possible obstruction of justice charges for providing
Mr. Toelupe with information regarding the FBI investigation;
and, without disclosing the extent of the lies, the AUSA still
moved for a six-level downward departure when Mr. Gatoloai was
sentenced in CR 00-00484. [Fourth Motion to Dismiss at 2-4.]

The exhibits to the Fourth Motion to Dismiss clearly
contain <u>Giglio</u> material. The Court therefore CONCLUDES that:
(1) the Government was required to produce all of the Toelupe
Cooperation Materials to Defendants; (2) the Government's failure
to produce the Toelupe Cooperation Materials by the applicable
deadlines, and certainly before Mr. Gatoloai's cross-examination,
violated its obligations under <u>Giglio</u>; and (3) the violations
were prejudicial.

**C.** **Appropriate Sanction**

This Court has concluded that the Government's
suppression of the Gatoloai FDC Recordings and the Toelupe
Cooperation Materials violated <u>Giglio</u> and/or *Jencks*. The

remaining issue is what remedy is appropriate under the
circumstances of this case.

In the Fourth Motion to Dismiss, Tootoo argues that the
only appropriate sanction is dismissal or, in the alternative,
striking Mr. Gatoloai's testimony.  Tootoo asserts that,

> given the volume of information recently produced,
> . . . the defense cannot be prepared to make
> effective use of it by re-calling Gatoloai.  For
> example, if we had timely received these
> materials, we could have included the agents to
> whom Gatoloai made the false statements on our
> witness lists, and made arrangements to have them
> here to testify.  As it currently stands, the
> defense will powerless [sic] to impeach Gatoloai
> if he denies making the false statements reflected
> in the reports.

[Fourth Motion to Dismiss at 5.]

First, the Government produced the Gatoloai FDC
Recordings to Defendants on January 14, 2014, and, on January 19,
2014, the Government identified specific recordings with possible
Giglio, Brady, *Jencks*, or Rule 16 information.  Thus, Defendants
had almost one month before Mr. Gatoloai was recalled to review
the Gatoloai FDC Recordings and to decide whether, and if so how,
to incorporate them into their examination strategies.  Further,
this Court ordered a recess in the trial to allow Defendants'
counsel time to review all of the FDC material, and it instructed
the jury that the reason for the recess was the Government's
failure to timely disclose potential impeachment evidence.  On
January 21, 2014, this Court instructed the jury:

We are going to have a delay in the trial, and I
need to tell you about it.

Evidence was recently turned over by the
government in violation of an order of this court
and the prosecution's constitutional obligation.
The government failed to produce evidence as to
certain witnesses, some of whom have already
testified.  This evidence may contain impeachment
evidence.

Impeachment evidence is evidence that may
undermine the credibility of a witness who has or
will testify at trial.  This evidence may also
contain exculpatory evidence.  Exculpatory
evidence is evidence that may tend to show that
Mr. Toilolo, Mr. Tootoo, Mr. Kaisa Tai, Mr. Akana,
Mr. Fola, or Mr. Dominguez may not be guilty
individually or collectively of the charges
against them.

The evidence recently turned over to defense
counsel contains hundreds of hours of recorded
conversations and thousands of pages of
information.  Defense counsel have the right to
review this evidence in order for the trial to
proceed in a fair and proper manner.

Therefore, we will not be holding court
today, Wednesday, Thursday, or Friday of this
week.  No additional time will be added to the
trial, and we will proceed on the schedule that
the court previously provided to you.

The government will complete its case by no
later than 3:30 p.m., on Thursday, January 30,
2014.  Because the government violated the court's
rules by not providing the evidence earlier, the
court is taking the number of days that we will be
in recess this week and deducting those days from
the time that the government has to present its
case.

[Tr. Trans. - Day 17 (1/21/14), filed 5/5/14 (dkt. no. 1254), at

126-27 (internal quotation marks omitted).]  While Toilolo argues

that the recess did not give counsel sufficient time to conduct

an adequate review of all the FDC materials, [Toilolo Reply at 26 n.15,] this Court disagrees. First, the recess, and the fact that the Court informed the jury about the reason for the recess, were significant and weigh against a finding that dismissal was the only available remedy for the suppression of the Gatoloai FDC Recordings.

Second, the suppression of the Toelupe Cooperation Materials was similar to the suppression of materials and information regarding Mr. Gatoloai's Toelupe Cooperation that this Court addressed in the 3/17/14 Order. After the briefing related to the Third Motion to Dismiss, Defendants were on notice that Mr. Gatoloai committed misconduct during the Toelupe Cooperation and that the Government had additional materials, which had not previously been disclosed, regarding that misconduct. See 3/17/14 Order, 2014 WL 1091715, at *7-8. Thus, while this Court in no way condones the Government's suppression of the Toelupe Cooperation Materials, the fact that Defendants already had a general awareness of Mr. Gatoloai's prior misconduct and the fact that they knew that the Government had additional material regarding the misconduct weighs against a finding that dismissal is the only adequate sanction.

Third, Defendants' concern – that they would need testimony from federal agents to rebut Mr. Gatoloai's testimony if he denied making false statements – did not materialize. When

Mr. Gatoloai was recalled for further cross-examination during Defendants' case, he acknowledged that he repeatedly lied in his post-arrest interview in December 2000, as well as during other interviews. He also acknowledged that the lies were so extensive that the AUSA handling the case told him that he faced possible charges for obstruction of justice. [Tr. Trans. - Day 27 (2/13/14) ("Day 27 Trans."), filed 5/5/14 (dkt. no. 1264), at 42-43.] In addition, Mr. Gatoloai also changed testimony that he gave when he testified during the Government's case. He acknowledged that he originally testified that, during the course of the Toelupe Cooperation, he had one conversation with his uncle, in violation of the Government's instructions to him. [Id. at 10-11.] He later admitted that he had multiple conversations with Mr. Toelupe regarding the pending investigation. [Id. at 16.]

Moreover, despite the fact that the Government produced the Toelupe Cooperation Materials only a few days before the filing of the Fourth Motion to Dismiss,[23] Defendants were able to make effective use of the materials during their further cross-examination of Mr. Gatoloai. For example, Tootoo's counsel confronted Mr. Gatoloai with recorded conversations between him and Mr. Toelupe in 2001, which were among the Toelupe Cooperation

---

[23] Tootoo filed the Fourth Motion to Dismiss on February 10, 2014, and Mr. Gatoloai was recalled for further cross-examination on February 13, 2014.

Materials.  See id. at 19.  After the recordings were played for
the jury, Mr. Gatoloai admitted that Mr. Toelupe instructed him
to tell the investigators that: (1) he and Mr. Toelupe had not
discussed the case; (2) he had only heard from other people that
Mr. Toelupe was selling "20-cent papers,"[24] even though he had
actually seen Mr. Toelupe doing so; and (3) he had never seen
Mr. Toelupe "do anything."  [Id. at 24-25, 28.]  Tootoo's counsel
also confronted Mr. Gatoloai with the August 16, 2001 FBI report,
which stated that he told the agents that Mr. Toelupe had been on
the mainland for a few months, and they had not spoken since
before his December 2000 arrest.  See id. at 34-36; Fourth Motion
to Dismiss, Exh. 4.  Mr. Gatoloai acknowledged lying during this
interview; he had actually spoken to Mr. Toelupe twelve days
before the interview and, during that conversation, Mr. Toelupe
said he was on Oahu.  Mr. Gatoloai also acknowledged that he lied
during this interview even though he had an agreement with the
Government which required him to tell the truth.  [Day 27 Trans.
at 36-39.]

        This Court therefore finds that allowing Defendants to
recall Mr. Gatoloai for further cross-examination was sufficient
to address the prejudice from the suppression of the Gatoloai FDC
Recordings and the Toelupe Cooperation Material.  Thus, neither

_____

        [24] Mr. Gatoloai testified that the term "papers" refers to
"[s]mall quantities of drugs," and "cent" is another word for a
dollar.  [Day 27 Trans. at 14.]

dismissal nor striking Mr. Gatoloai's testimony was necessary.
Although the Government's conduct was inexcusable, this Court
does not find that the suppression of Gatoloai materials rose to
the level of a due process violation. Further, this Court
declines to exercise its supervisory powers to dismiss the Third
Superseding Indictment.

**V.    Other FDC Materials**

In addition to the FDC materials regarding John Tai and
Mr. Gatoloai, the 1/13/14 Letter informed Defendants of the
existence of:

-recorded telephone calls made by Walter Dominguez, Toilolo,
    Louis Tai, Tootoo, Kaisa Tai, and Daniel Fola;

-financial records, e-mail contact lists, phone contact lists,
    e-mail records, phone records, and visiting records for
    Louis Tai, Kaisa Tai, Toilolo, Daniel Fola, Harry Akana, and
    Walter Dominguez; and

-e-mails involving either Walter Dominguez or Toilolo.

In addition, on January 14, 2014, AUSA Muehleck sent Defendants'
counsel a letter informing them that there were recordings of
another 186 calls that Tootoo made while an inmate at FDC.
[Kimura Decl., Exh. E.] This Court will refer to all of these
collectively as the "Remaining FDC Material."

Defendants did not attach any of these documents to the
Motions to Dismiss, nor did they summarize any of the specific
information contained in these recordings. This Court cannot
determine from the brief descriptions in the January 2014

Inventory whether the Government's failure to produce any of these materials was a violation of <u>Brady</u>, <u>Giglio</u>, *Jencks*, or Rule 16. This Court therefore CONCLUDES that Defendants are not entitled to sanctions based upon the late disclosure of the Remaining FDC Material.

## VI. **Cumulative Effect**

The Ninth Circuit has stated that, after a court evaluates "the tendency and force of each" <u>Brady</u> or <u>Giglio</u> violation, the court must "evaluate its cumulative effect." <u>United States v. Kohring</u>, 637 F.3d 895, 903 (9th Cir. 2011) (citations omitted). As noted, *supra*, suppressed evidence will only be found to be prejudicial or material where it is reasonably probable that the disclosure of the material would have changed the outcome of the proceeding.

> There is a "reasonable probability" of prejudice when suppression of evidence "undermines confidence in the outcome of the trial." <u>Kyles [v. Whitley]</u>, 514 U.S. [419,] 434, 115 S. Ct. 1555 [(1995)] (citing <u>Bagley</u>, 473 U.S. at 678, 105 S. Ct. 3375). A "reasonable probability" may be found "even where the remaining evidence would have been sufficient to convict the defendant." <u>Jackson [v. Brown]</u>, 513 F.3d [1057,] 1071 [(9th Cir. 2008)] (citing <u>Strickler [v. Greene]</u>, 527 U.S. [263,] 290, 119 S. Ct. 1936 [(1999)]).

<u>Id.</u> at 912.

In the present case, although the Government failed on multiple occasions to fulfill its discovery obligations, the vast majority of the materials at issue were ultimately disclosed to

Defendants, and they were able to utilize those materials during the First Trial. Further, this Court imposed significant sanctions against the Government, including, *inter alia*: striking John Tai's testimony; allowing Defendants to recall Agent Chambers, Mr. Gatoloai, and Mr. Fonoti to confront them regarding materials produced during trial; and referring AUSA Loo to OPR. This Court also informed the jury that the sanctions were imposed because of the prosecutorial misconduct.[25] This Court finds that, because of the significant sanctions that it imposed to remedy the prejudice to Defendants, the Government's misconduct did not undermine confidence in the outcome of the trial.

In addition, this Court does not find that there is a reasonable probability that the result of the proceedings against Toilolo and Walter Dominguez would have been different if the suppressed evidence had been produced to Defendants by the original deadlines. As stated above, the majority of the materials at issue were ultimately produced to Defendants. Further, even without the testimony of John Tai, there was strong evidence against Toilolo and Walter Dominguez. This Court has stated:

> the Government's evidence is robust against
> several defendants. For instance, there are:
> (1) videotaped recordings of [Walter]
> Dominguez . . . , and audio recordings of

---

[25] This Court did not inform the jury that it was referring AUSA Loo to OPR.

> Toilolo . . . , each allegedly discussing drug
> distribution; (2) physical evidence of
> methamphetamine that a witness testified was
> obtained from [Walter] Dominguez; (3) witnesses
> who testified that, at [Walter] Dominguez's
> direction, they brought and/or received
> methamphetamine or proceeds from the sale of
> methamphetamine to and from Hawaii; (4) a witness
> who testified that he received proceeds from the
> sale of methamphetamine from and delivered
> methamphetamine to Toilolo; and (5) cooperating
> defendants involved in the drug distribution
> conspiracy who testified that Toilolo . . . and
> Walter Dominguez were involved in a drug
> distribution conspiracy with the cooperating
> defendants.

3/17/14 Order, 2014 WL 1091715, at *11. This Court therefore

CONCLUDES that, cumulatively, the Government's discovery

violations were not prejudicial.

Even assuming, *arguendo*, that this Court concluded that

the cumulative violations were prejudicial, it would not impose

the draconian sanction of dismissal. In the 3/17/14 Order, this

Court concluded that "the Government has been sloppy, inexcusably

tardy, and almost grossly negligent in meeting its discovery

obligations," and "the Government's conduct and apparent failure

to own up to the seriousness of these actions" was "deeply

troubl[ing]." 2014 WL 1091715, at *10. Despite these

conclusions, this Court could not "conclude that the Government

acted 'flagrantly, willfully, and in bad faith.'" Id. (quoting

Chapman, 524 F.3d at 1084-85). The Third and Fourth Motions to

Dismiss address further discovery violations by the Government,

but the additional violations do not alter the conclusions that

this Court made in the 3/17/14 Order regarding the Government's conduct. Although it is a close question, this Court still cannot conclude that the Government acted "flagrantly, willfully, and in bad faith." This Court therefore declines to exercise its supervisory authority to dismiss the Third Superseding Indictment. See Kohring, 637 F.3d at 912-13 (some citations omitted) (citing United States v. Kearns, 5 F.3d 1251, 1255 (9th Cir. 1993) (holding that even though the government's conduct "may have been negligent, or even grossly negligent," it did not rise to the level of flagrant misconduct)). Further, although the Government's actions could be described as "outrageous," this Court cannot conclude that the Government's outrageous actions were so severe as to rise to the level of "a due process violation," which would have also warranted dismissal of the Third Superseding Indictment. See id. at 913.

This Court therefore CONCLUDES that the cumulative effect of the Government's misconduct in its preparation for, and litigation of, the First Trial does not warrant dismissal. Although the Government's repeated discovery violations were inexcusable, the sanctions that this Court imposed were significant and sufficiently addressed the prejudice to Defendants.

**CONCLUSION**

On the basis of the foregoing, the following are HEREBY DENIED: the Third Motion to Dismiss Indictment, filed on January 14, 2014; Defendant Fouina C. Toilolo's joinder and Defendant Walter Dominguez's joinder thereto, filed on January 14, 2014 and January 21, 2014, respectively; the Fourth Motion to Dismiss Indictment, or in the Alternative, to Strike Testimony of Pulaa Gatoloai, filed February 10, 2014; Toilolo's joinder thereto, filed February 11, 2014; and Toilolo's Fifth Motion for Dismissal with Prejudice as to Count 1 of the Third Superseding Indictment, filed March 31, 2014.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, JUNE 30, 2015.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

UNITED STATES V. FOUINA C. TOILOLO, ET AL.; CRIMINAL NO. 11-00506 LEK; ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS AND JOINDERS THERETO